In the Matter of the Application of Linwood K. PAYNE, Jr., Deceased by Betty Lou Payne, Executrix, John A. Durden, Jr. and Mathias H. J. Weiden, Appellants.

Patent Appeal No. 77–522.

United States Court of Customs and Patent Appeals.

Sept. 13, 1979.

Robert C. Brown, Aldo J. Cozzi, New York City, attorneys of record, for appellants; James C. Arvantes, Arlington, Va., of counsel.

**304**

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Gerald H. Bjorge, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and RE,* Chief Judge.

MARKEY, Chief Judge.

Payne *et al.* (Payne) appeal from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) sustaining the rejection under 35 U.S.C. § 103 of claims 1–12 of application serial No. 254,271, filed May 17, 1972, for "Pesticidal Compositions." We *affirm.*

### The Invention

Payne invented five, six, and seven member heterocyclic carbamoyloximino compounds having pesticidal activity. The claims on appeal are:

1. As new compositions of matter compounds having the structural formula:

wherein:

$R^1$ is hydrogen or alkyl having from 1 to 4 carbon atoms;

$R^2$ is hydrogen, lower alkyl, lower alkenyl, lower alkynyl, halogen substituted lower alkyl, lower alkoxyalkyl, lower alkylthioalkyl, lower alkoxy, phenyl, lower alkyl substituted phenyl, lower phenyl alkyl or halogen substituted phenyl;

$R^3$ and $R^4$ may be the same or different and are hydrogen, lower alkyl having from 1 to 6 carbon atoms, lower alkenyl having from 2 to 6 carbon atoms, halogen substituted alkyl having from 1 to 6 carbon atoms, alkoxyalkyl having a total of from 2 to 6 carbon atoms, alkylthioalkyl having a total of 2 to 6 carbon atoms, phenyl, lower alkylphenyl, halogen substituted phenyl, or lower alkoxyphenyl;

A is methylene, ethylene, propylene, ethenylene, propenylene or methylene, ethylene, propylene, ethenylene, or propenylene substituted with one or more alkyl groups having from 1 to 3 carbon atoms; and

x is 0, 1 or 2.

2. Compositions as claimed in claim 1 wherein A is methylene.

3. Compositions as claimed in claim 1 wherein A is ethylene.

4. Compositions as claimed in claim 1 wherein A is propylene.

5. Compositions as claimed in claim 1 wherein $R^1$ is hydrogen and $R^2$ is methyl.

6. 5,5-Dimethyl-4-(methylcarbamoyloximino)-1,3-dithiolane.

7. 2-(Carbamoyloximino)-1, 4-dithiane.

8. 2-(Methylcarbamoyloximino)-1, 4-dithiane.

9. 3-Methyl-2-(methylcarbamoyloximino)-1, 4-dithiane.

10. 3,3-Dimethyl-2-(methylcarbamoyloximino)-1, 4-dithiane.

11. 2-(Methylcarbamoyloximino)-4-oxo-1, 4-dithiane.

12. 3,3-Dimethyl-2-(methylcarbamoyloximino)-1, 4-dithiene-5.

### The Rejection—Structure and Properties

The principal references relied upon by the examiner were:

| | | |
|---|---|---|
| Addor (Addor I) | 3,193,561 | July 6, 1965 |
| Addor (Addor II) | 3,365,361 | January 23, 1968 |
| Addor (Addor III) | 3,467,672 | September 16, 1969 |
| Ghosh *et al.* (Ghosh) | 3,661,930 | May 9, 1972 |
| Nikles | 3,678,075 | July 18, 1972 |

Addor I discloses pesticidal compounds with five or six member heterocyclic rings containing two sulfur atoms and a carbamoyloximino moiety, as exemplified by the general structure:

$$N-O-C(=O)-N\big\langle$$

with C bonded to two S atoms and $(CH_2)_n$

---

* The Honorable Edward D. Re, United States Customs Court, sitting by designation.

Addor II discloses a group of pesticides, all with six member heterocyclic rings containing two sulfur atoms and a carbamoyloximino moiety, having the structure:

$$N-O-\overset{\overset{\displaystyle O}{\|}}{C}-N<$$

with ring:
$$S-C-S$$

Addor III discloses pesticides structurally identical to the Addor I five-membered ring compounds except that the ring is unsaturated.

Ghosh discloses pesticidal compounds with seven member heterocyclic rings containing two sulfur atoms and a carbamoyloximino moiety, as exemplified by the structure:

$$N-O-\overset{\overset{\displaystyle O}{\|}}{C}-N<$$

with ring:
$$S-C-S$$

Nikles discloses pesticides structurally identical to the Addor I five-membered ring compounds except that an alkenyl substituent is attached to the ring.

The claimed compounds differ from the primary reference compounds only in the sulfur-carbamoyloximino moiety linkage. In the claimed compounds, one sulfur is linked directly to the carbamoyloximino moiety and the other sulfur is linked directly to an intervening carbon atom, which is in turn linked directly to the carbamoyloximino moiety. In the primary references, both sulfur atoms are linked directly either to the carbamoyloximino moiety (Addor I; Addor III; Nikles) or to intervening carbon atoms which are in turn linked directly to the carbamoyloximino moiety (Addor II; Ghosh).

1. Only Haubein and the Japanese patent disclose ring structures like those of Payne's compounds, i. e., ring structures with same positions of the two sulfur atoms relative to the most significantly substituted carbon atom.

The secondary references were:

| | | |
|---|---|---|
| Walsh | 3,564,013 | February 16, 1971 |
| Japanese patent | 40–2073 | February 3, 1965 |
| Haubein | 2,766,166 | October 9, 1956 |
| German patent | 1,203,797 | October 28, 1965 |

Walsh discloses pesticidal phosphonated heterocyclic mercaptal compounds, exemplified by the structure:

$$(CH_2)_n-S-\overset{\overset{\displaystyle X}{\|}}{P}<$$

with ring containing $CH$, $S$, $S$, $(CH_2)_n$

The Japanese patent discloses pesticidal dithiophosphate compounds, exemplified by the structure:

$$CH_2-S-\overset{\overset{\displaystyle S}{\|}}{P}<$$

with ring, R attached

Haubein discloses pesticidal dithiophosphate compounds having the structural formula:

$$S-\overset{\overset{\displaystyle S}{\|}}{P}<$$

1/

with ring

The secondary references were cited for their disclosure that phosphonated dithiacy-

However, neither discloses carbamate compounds, i. e., compounds containing the radical:

$$-O-\overset{\overset{\displaystyle O}{\|}}{C}-N<$$

cloalkanes exhibit pesticidal activity when substituted at any ring position. The examiner related the principal references' showing of carbamoyloximino substituted[2] dithiacycloalkanes as pesticides with the Walsh, Haubein, and Japanese patent suggestion "that the carbamoyloximino group may equivalently substitute any position on the heterocyclic ring." The German patent was cited for its teaching that the sulfur atom in thiacycloalkane pesticides may be equivalently oxidized.

The examiner rejected claims 1–11 as obvious in view of each of Addor I, Addor II, and Ghosh; claims 1–5 as obvious in view of Nikles; claims 1 and 12 as obvious in view of Addor III; and all claims as obvious in view of Addor I, Addor II, Ghosh, Addor III, and Nikles in view of Walsh, Haubein, the Japanese patent, and the German patent.[3] The fundamental basis for each rejection was that the claimed compounds are position isomers or methylene ring homologs of the compounds of the principal references, having a close structural similarity to, and a community of properties with, the principal reference compounds.

Payne presented the affidavit of coinventor Durden,[4] Table I of which allegedly illustrates lack of structural obviousness in differences between the oxidation states of the two sulfur atoms in the claimed compounds and the oxidation states of the two sulphur atoms in prior art compounds. Table II purportedly establishes an unexpectedly superior scope and level of pesticidal activity of the claimed compounds in a comparison of "the most representative compound of Addor I" with four of Payne's compounds:

TABLE II

| Compound | | Insect Toxicity (LD50, ppm) [5] | | | | |
|---|---|---|---|---|---|---|
| | | Aphid | Mite | Armyworm | Bean Beetle | Housefly |
| ADDOR-I | =NOCONHCH₃ | ~1 | 90 | 160 | 230 | 0.7 |
| APPLICANTS-1 | =NCCONHCH₃ | 5 | 6 | 53 | 35 | 4 |
| APPLICANTS-2 | =NCCONHCH₃ | 4 | 6 | 60 | 11 | 4 |
| APPLICANTS-3 | =NOCONHCH₃ | 65 | 55 | 100 | 28 | <1 |
| APPLICANTS-4 | =NCCNHCH₃ | 6 | 2 | 16 | 23 | 4 |

2. The moiety properly described as "carbamoyloximino" can be represented by the structural formula:

$$N - O - C(=O) - N<$$

$$\| C$$

Because the initial carbon of the moiety is also one of the ring carbons, it is not correct to describe this moiety as a ring substituent in either Payne's compounds or those of the principal references.

3. The board disagreed with the examiner's contention that a Jones et al. reference suggested the pesticidal activity of a thiolane ring alone.

4. Payne presented a second Durden affidavit stating only that the test results of the first were obtained by spray test procedures described in Payne's specification.

5. "LD 50, (ppm)" represents the number of parts per million (ppm) of test solution needed to achieve a 50% kill.

Table III presents insect toxicity data for four compounds said to be closely related to the Addor II compounds by virtue of the sulfur atoms and oximino-substituted carbon atoms having the same oxidation states.[6] Durden concluded from Table III that the Addor II compounds, and the Ghosh compounds (homologs of the Addor II compounds), were ineffective pesticides except for limited activity against aphid and housefly. Table V,[7] comparing two of Payne's compounds with their "linear or aliphatic analogs" and reflecting erratic activity of linear compounds and their inactivity against armyworm, is said to illustrate unique broad spectrum activity in the claimed compounds:

TABLE V

| Compound | | Insect Toxicity (LD50, ppm) | | | | |
|---|---|---|---|---|---|---|
| | | Aphid | Mite | Armyworm | Bean Beetle | Housefly |
| Aldicarb | $CH_3S-C(CH_3)_2-C(H)=NOCONHCH_3$ | 4 | 15 | 500 | 70 | 4 |
| L-1 | $CH_3-C(CH_3)_2-C(SCH_3)=NOCONHCH_3$ | 15 | 500 | 500 | 50 | 500 |
| L-2 | $CH_3SC(CH_3)_2-C(SCH_3)=NOCONHCH_3$ | 25 | 50 | 500 | 50 | 100 |
| Applicants-4 | (dithiolane) $CH_3$, $=NOCONHCH_3$ | 6 | 2 | 16 | 23 | 4 |
| Applicants-5 | (dithiane) $CH_3$, $NOCONHCH_3$ | 0.8 | 4 | 140 | 80 | 12 |

The examiner found Durden's affidavit insufficient:

> The test results reported in Table II of the first Durden Affidavit cannot be seen to establish the unobviousness of the presently claimed compounds over Addor I. The Addor I compounds are superior to the closest structurally related compounds of the present invention, designated as Applicants–1, Applicants–2, Applicants–3 and Applicants–4, in their effect on aphids and houseflies, i. e., the claimed compounds required applications of from 4 to 65 times greater than the Addor I compound to effect the same kill.

Although Applicants–1, Applicants–2, Applicants–3 and Applicants–4 do show a greater toxicity against mites, armyworms and bean beetles, it is noted that there is as much or greater difference observed *among* the compounds of the present application as there is *between* the compounds of the present application and Addor I. Note the greater differences in toxicity between the homologous compounds Applicants–3 and Applicants–4 as compared to the lesser differences in toxicity between the Applicants–3 and the isomeric compound of Addor I. Such wide variation of toxici-

6. Durden said he could not make direct comparison tests of Addor II compounds due to unavailability of materials.

7. Table IV relates only to the Jones *et al.* reference. *See* note 3 *supra*.

ties cannot be seen to establish the unobviousness of the presently claimed compounds as a whole over the Addor I compounds.

No information has been presented comparing the claimed compounds with those of Addor II, Ghosh, Addor III or Nikles and the present claims thus remain validly rejected thereover.

The results reported in Tables III through V of the first Durden Affidavit do not compare the claimed compounds with compounds of the references of record in this rejection and garner Appellants nothing in their attempt to demonstrate patentability over the prior art.

### The Board

The board agreed with the examiner that the claimed compounds would have been prima facie obvious from either their close structural similarity to prior art pesticides or from the combination therewith of the secondary references teaching that dithiacycloalkane pesticidal compounds may be substituted at any ring position, albeit with a different substituent.

In response to Payne's challenge to the examiner's conclusion of structural obviousness the board stated:

The challenge is based on an allegation that the claimed compounds are not true isomers or homologs of prior art compounds since the oxidation states of the oximino substituted carbon atom and the ring sulfur atoms are different in the prior art compounds. It is urged that, in the absence of such a true isomeric or homologous relationship, the legal conclusion of structural obviousness is unwarranted. In our opinion, it is reasonably well settled that the name given to the relationship between two compounds is not important. It is the *closeness* of the relationship which is dispositive of the question of obviousness * * *.

Here, the prior art discloses two classes of related compounds, one with a single oximino substituted carbon atom between the two ring sulfur atoms and the other with three intermediate carbons. The oxidation states of the substituted carbon atoms and the ring sulfur atoms are clearly different in the two classes of compounds yet both are known to exhibit pesticidal activity. We believe that the Examiner has correctly applied the standard of 35 U.S.C. [§] 103 in finding the structural relationship between the claimed compounds and the * * * prior art compounds * * * to be so close that the former would be *prima facie* obvious over the latter. Compounds on both sides of the claimed compounds are known to have similar utilities as pesticides despite the theoretical structural differences noted by appellants and we conclude that the recognition of similar differences between the claimed compounds and the prior art would not have deterred the routineer from making and using the claimed compounds in accordance with techniques suggested by the references relied upon in the rejections.

The board found the Durden affidavit insufficient:

At the outset, we note that Table I, dealing with an alleged difference in oxidation states between the claimed compounds and those of the prior art, is irrelevant once the threshold question of *prima facie* obviousness has been determined (see discussion above). There is no demonstrated relationship between the noted differences in oxidation state and insecticidal activity.

Table II provides the only valid comparison of the claimed compounds and those of the prior art. Only one of the Addor I compounds is tested and the comparative results are inconclusive. Appellants' compounds are sometimes better and sometimes worse than the prior art.

In our opinion, one skilled in the art would expect *some* differences in insecticidal effect. Although the affidavit shows that the compared compounds have *different* insecticidal properties, we are not persuaded that the difference would have been *unexpected.*

Finally, we agree with the Examiner that the comparisons of Tables III through V are of no evidentiary value for purposes of rebutting the above-noted *prima facie* case of obviousness. The unreliability of the attempted comparison is exemplified by the inconsistency between Table III and the teachings of Ghosh et al. at Table II wherein the methylene homolog of the compound purportedly exemplified by appellants' comparison A is shown to be very effective against aphid (*Aphis fabae*) yet the substituted comparison is said to be totally ineffective against aphid. The compared compounds are simply not close enough to those of the references relied upon to be probative of unobviousness.

### Remand—Procedure

After Payne filed an appeal to this court, the solicitor moved to remand. By an order of August 10, 1977, the court stayed proceedings "for the specific purpose of considering the issue of nonenablement of the prior art." The board then remanded the case to the examiner for a search and report on that issue. On September 13, 1977, the examiner submitted to the board a Supplementary Examiner's Answer stating that the prior art contains an enabling disclosure.

Following a further stay by this court and an extension by the board of Payne's time to respond until October 19, 1977, Payne filed with the board a Supplemental Reply Brief on October 18, 1977. The board remanded to the examiner on November 29, 1977 for consideration of Payne's Reply Brief. The examiner responded on April 3, 1978, with an Examiner's Answer on Remand.

Payne apparently elected to rely upon the Supplemental Reply Brief, and so informed the board's clerk during a telephone inquiry on May 11, 1978. On May 22, 1978, however, Payne filed a Reply to the Examiner's Answer on Remand. In a decision of May 23, 1978, the board stated:

The Examiner's last paper is a clear and complete exposition of the manner in which the prior art provides the necessary enablement. Inasmuch as appellants do not contest the reasoning advanced by the Examiner, and we do not perceive any error in that reasoning, we hold that the enablement requirement has been satisfied, thus serving the purpose of the remand.

On June 12, 1978, the board advised that Payne's paper of May 22, 1978 did not reach the board until June 8, 1978 and would not be considered.

On June 22, 1978, Payne filed a Request for Reconsideration of the board's May 23, 1978 decision. Denying Payne's request, the board refused to treat Payne's Supplemental Reply Brief of October 18, 1977, as a traverse of the Examiner's Answer on Remand of April 3, 1978, and refused to consider the points it had refused to consider in Payne's paper of May 22, 1978. Payne renewed the appeal in this court.

The issue of prior art enablement is inherent in the determination of obviousness and constituted the basis for the remand and for the stay issued by this court. Hence that issue is fully treated on this appeal, the board's original decision and that on remand being considered as one.

### On Remand—Prior Art Enablement

Payne's specification discloses this general reaction scheme for preparing the claimed compounds:

310

where A, $R^1$, $R^2$, $R^3$ and $R^4$ are as defined [in claim 1] above.

The compositions of this invention where $R^1$ is hydrogen can also be prepared by reacting the appropriate oximine precursor with an isocyanate in accordance with the following general reaction scheme:

III

where A, $R^2$, $R^3$ and $R^4$ are as defined above.

The oxime precursors can be prepared in various ways for example, oximino dithiane compositions can be prepared in accordance with the following general reaction scheme:

IV  $HS-A-S-\overset{\overset{\displaystyle R^3}{|}}{\underset{\underset{\displaystyle R^4}{|}}{C}}-CH_2NO_2 \xrightarrow{KOCH_3}$

where A, $R^3$ and $R^4$ are as defined above.

$$V \quad \underset{\underset{R^4}{|}}{\overset{\overset{R^3}{|}\quad\overset{NOH}{\|}}{X-C-CX}} + NaS-A-SNa \longrightarrow$$

where A, $R^3$ and $R^4$ are as defined above and X is chloro or bromo.

In advancing the view that one of ordinary skill would have been aware of a

Alternatively, the oximino dithiane compositions can be prepared by the following general reaction:

method for producing the claimed compounds, the examiner proposed three procedures, each concluding with this reaction:

The examiner's reaction step is essentially that disclosed by Addor I, Addor II, Ghosh, and Nikles. The examiner's three procedures, all directed to producing the oxime intermediate [8] required for the above final reaction, were constructed from these references:

U.S. Patents

| | | |
|---|---|---|
| Miller et al. (Miller) | 3,209,012 | September 28, 1965 |
| Addor (Addor IV) | 3,317,562 | May 2, 1967 |
| Brace | 3,172,910 | March 9, 1965 |
| Metivier (Metivier I) | 2,943,974 | July 5, 1960 |
| Metivier et al. (Metivier II) | 3,327,025 | June 20, 1967 |
| Esclamadon | 3,673,260 | June 27, 1972 |

Articles

Howard et al. (Howard), 82 J.Am.Chem. Soc'y 158–64 (1960)

Williamson et al. (Williamson), 31 J.Natl. Cancer Inst. 273–96 (1963)

Ford et al. (Ford), 70 J.Am.Chem.Soc'y 3522–23 (1948)

Voronkina et al. (Voronkina), 32 Zhur. Obschchei Khim 2098–101 (1962)

The examiner contended that the three procedures were suggested by analogy to specific reactions disclosed in Howard, Miller, and Addor IV, respectively. With the prior art reactions said to suggest, them, the procedures can be summarized:

[See following illustration.]

8. Oximes are compounds containing the radical $\underset{/}{\overset{\backslash}{C}} = N - O - H.$

HOWARD ANALOGY:

STEP I

(Howard)    $NaS(CH_2)_nSNa + ClCH_2-CCH_2Cl \longrightarrow$

$$\underset{O}{\overset{O}{\parallel}}$$

(Analogous)    $NaS(CH_2)_nSNa + ClCH_2CCl \longrightarrow$

$$\overset{O}{\overset{\parallel}{}}$$

MILLER ANALOGY:

STEP I

(Miller)    $HSCH_2COH + R_2CR_1 \longrightarrow$

$$\underset{}{\overset{O}{\parallel}} \quad \underset{}{\overset{O}{\parallel}}$$

$R_1, R_2 = H, Alkyl,$ etc.

(Analogous)    $HSCH_2CSH + R_2CR_1 \longrightarrow$

$$\overset{O}{\overset{\parallel}{}} \quad \overset{O}{\overset{\parallel}{}}$$

HOWARD ANALOGY

MILLER ANALOGY

STEP II

(Addor II)
(Ghosh)

(Analogous)

**ADDOR IV ANALOGY**

**STEP I:**

(Addor IV)  $Hal-(CH_2)_n-CN$  +  $CH_3\overset{O}{\overset{||}{C}}SH$  $\xrightarrow{KCO_3}$  $CH_3\overset{O}{\overset{||}{C}}S-(CH_2)_n-CN$

(Analogous)  $Hal-A-S-\overset{R^3}{\underset{R^4}{\overset{|}{\underset{|}{C}}}}-CN$  +  $CH_3\overset{O}{\overset{||}{C}}SH$  $\xrightarrow{KCO_3}$  $CH_3\overset{O}{\overset{||}{C}}-S-A-S-\overset{R^3}{\underset{R^4}{\overset{|}{\underset{|}{C}}}}-CN$

**STEP II:**

(Addor IV)  $CH_3\overset{O}{\overset{||}{C}}S-(CH_2)_n-CN$  $\xrightarrow{HX}$  (ring structure with $NH_2X$, C, $(CH_2)_n$, S)

(Analogous)  $CH_3\overset{O}{\overset{||}{C}}S-A-S-\overset{R^3}{\underset{R^4}{\overset{|}{\underset{|}{C}}}}-CN$  $\xrightarrow{HX}$  (ring structure with $NH_2X$, C, $R^3$, $R^4$, C, S, S, A)

**STEP III:**

(Addor IV)  (ring with $NH_2X$, C, $(CH_2)_x$, S)  +  $NH_2OH$  $\longrightarrow$  (ring with NOH, C, $(CH_2)_x$, S)

(Analogous)  (ring with $NH_2X$, $R^3$, $R^4$, C, C, S, S, A)  +  $NH_2OH$  $\longrightarrow$  (ring with NOH, $R^3$, $R^4$, C, C, S, S, A)

---

Williamson discloses the nitrile substituted starting materials used in Step I of the Addor IV analogy. The other references cited on remand, were said to teach alternative methods for obtaining the substituted nitrile starting materials.

## ISSUES

The issues are:

(1) Whether prima facie obviousness is present for each claim,

(2) Whether the prior art provides an enabling disclosure, i. e., whether it disclosed or would have rendered obvious a method of preparing the claimed compounds, and

(3) Whether prima facie obviousness, if present, has been rebutted.

## OPINION

### (1) *Obviousness*

■ An obviousness rejection based on similarity in chemical structure and function entails the motivation of one skilled in the art to make a claimed compound, in the expectation that compounds similar in structure will have similar properties. *In re Gyurik*, 596 F.2d 1012, 1018, 201 USPQ 552, 557 (CCPA 1979); *See In re May*, 574 F.2d 1082, 1094, 197 USPQ 601, 611 (CCPA 1978); *In re Hoch*, 428 F.2d 1341, 1344, 57

CCPA 1292, 1296, 166 USPQ 406, 409 (1970). Because of the close structural similarity between the claimed compounds at issue here and the compounds of Addor I, II, and III, Ghosh, and Nikles, and because those prior art compounds possess pesticidal activity, we conclude that the required motivation is present here. *See In re Wood,* 582 F.2d 638, 641, 199 USPQ 137, 139 (CCPA 1978). When prior art compounds essentially "bracketing" the claimed compounds in structural similarity are all known as pesticides, one of ordinary skill in the art would clearly be motivated to make those claimed compounds in searching for new pesticides.

██ Payne points to an absence of a true isomeric or homologous relationship between the prior art and claimed compounds. However, as the board correctly noted, this court has held that "[t]he name used to designate the relationship between related compound is not necessarily controlling; it is the closeness of that relationship which is indicative of the obviousness or unobviousness of the new compound." *In re Druey,* 319 F.2d 237, 240, 50 CCPA 1538, 1541, 138 USPQ 39, 41 (1963); *See In re Herr,* 304 F.2d 906, 909, 50 CCPA 705, 708, 134 USPQ 176, 178 (1962). The similarity in chemical structures and properties between the prior art and claimed compounds is sufficiently close to support a prima facie case of obviousness. The only structural difference is that the ring structures of the prior art have one or three carbon atoms between two sulfur atoms, whereas the ring structures of the claimed compounds have two carbon atoms between two sulfur atoms, with one of the intervening carbon atoms being part of a carbamoyloximino moiety in each case. Thus the ring structures of the prior art are balanced, with each sulfur atom linked either directly to the carbamoyloximino moiety or linked thereto through one carbon atom, whereas the ring structures of the claimed compounds are unbalanced, with one sulfur atom linked directly to the carbamoyloximino moiety and the other sulfur atom linked thereto through one carbon atom.

Payne attacks the conclusion of structural obviousness, pointing to theoretical differences in the oxidation states of the two ring sulfur atoms and carbamoyloximino carbon atom of the claimed compounds from those of the prior art. We agree with the board's statement that those theoretical differences do not defeat obviousness:

[T]he prior art discloses two classes of related compounds, one with a single oximino substituted carbon atom between two ring sulfur atoms and the other with three intermediate carbons. The oxidation states of the substituted carbon atoms and the ring sulfur atoms are clearly different in the two classes of compounds yet both are known to exhibit pesticidal activity.

The differences in the number and location of carbon atoms relative to the sulfur atoms among the compounds of the prior art references indicate that there would be a difference in oxidation state of each carbon and sulfur atom. Appellants' burden, however, is not merely to point out that differences in oxidation state exist, but to show that the oxidation states of the atoms in his compounds were different from what the prior art would have suggested.

### (2) *Enablement*

██ References relied upon to support a rejection under 35 USC 103 must provide an enabling disclosure, *i. e.,* they must place the claimed invention in the possession of the public. *In re Brown,* 329 F.2d 1006, 1011, 51 CCPA 1254, 1259, 141 USPQ 245, 249 (1964). An invention is not "possessed" absent some known or obvious way to make it. *In re Hoeksema,* 399 F.2d 269, 274, 55 CCPA 1493, 1500, 158 USPQ 596, 601 (1968). Hence, the presumption of obviousness based on close structural similarity is overcome where the prior art does not disclose or render obvious a method for making the

claimed compound. *Id.* at 1500, 399 F.2d at 274, 158 USPQ at 601. It can be assumed that the method disclosed for making the reference compound would provide those skilled in the art with a method for making the structurally similar claimed compounds. *In re Grose,* 592 F.2d 1161, 1168, 201 USPQ 57, 63 (CCPA 1979). However, the PTO can properly rely on additional references. *Cf. In re Samour,* 571 F.2d 559, 562–63, 197 USPQ 1, 4 (CCPA 1978). Moreover, the method suggested by the prior art need not be that disclosed by the applicant. *In re Maloney,* 411 F.2d 1321, 1323–25, 56 CCPA 1218, 1221–23, 162 USPQ 98, 100–02 (1969).

■ In the present case, Payne labelled the examiner's suggested methods a "[s]peculative reconstruction of prior art processes" used to make "a series of intermediate compounds never before imagined or made." Step I of the Miller analogy differs from the Miller reaction only in the substitution of a sulphur atom for an oxygen atom in the acid starting material.[9] The use of new starting material or the obtaining of new resultant compounds is never alone sufficient to render unobvious a method otherwise analogous to that of the prior art. *In re Kanter,* 399 F.2d 249, 251, 55 CCPA 1395, 1397–98, 158 USPQ 331, 332–33 (1968). We find the Miller analogy sufficiently suggested by the prior art to place within the possession of the public a method for making Payne's compounds. Thus, the PTO met its burden of establishing a prima facie case of enablement.

The burden thus shifted to Payne to present "reason or authority for believing" that the examiner's analogies would be inoperable. *In re Hoeksema,* supra, 399 F.2d at 274–75, 55 CCPA at 1501, 158 USPQ at 601; *In re Ross,* 305 F.2d 878, 881, 49 CCPA

1276, 1280, 134 USPQ 320, 322 (1962). Attempting to carry that burden against the Miller analogy, Payne argues that (1) the reactivity of the thioacid used in step I was so inferior to that of Miller's carboxylic acid that it would be incapable of reacting with the ketone to form a ring, and (2) the hydroxylamine taught by Addor II and Ghosh as successfully reacting with stable thioether ketones would, when used in step II of the analogy, act as such a strong hydrolyzing agent that it would cleave the relatively unstable thioether-thioester ring.

■ Arguments of counsel unsupported by competent factual evidence of record are entitled to little weight. *In re Lindner,* 457 F.2d 506, 508, 59 CCPA 920, 923, 173 USPQ 356, 358 (1972). To successfully rebut the examiner's prima facie case of enablement, it was incumbent upon Payne to introduce affidavits or other factual evidence in support of his position. *In re Hoeksema, supra,* 399 F.2d at 275, 55 CCPA at 1501, 158 USPQ at 601. Facts, such as test data demonstrating inoperativeness of the Miller analogy, or facts set forth in an affidavit (37 CFR 1.132) of an expert in the field suggesting that inoperativeness, would be highly probative. *In re Aufhauser,* 399 F.2d 275, 282, 55 CCPA 1477, 1485, 158 USPQ 351, 356 (1968); *In re Hoeksema, supra,* 399 F.2d at 275, 55 CCPA at 1501, 158 USPQ at 601; *In re Fay,* 347 F.2d 597, 603, 52 CCPA 1483, 1489–90, 146 USPQ 47, 51 (1965). Payne having presented no such evidence, the examiner's prima facie case of enablement must stand.

### (3) *Rebuttal Evidence*

■ A prima facie case of obviousness based on structural similarity is rebuttable

---

**9.** In view of our holding respecting the Miller analogy, we need not consider the sufficiency of the examiner's Howard or Addor IV analogies, or the board's refusal to consider Payne's May 22, 1978 Reply to the Examiner's Answer on Remand, that Answer and Reply being directed solely to the Addor IV analogy. If there

be in the board's opinion an implication that absence of a reply brief is construable as a concession, however, that implication would be insupportable.

by proof that the claimed compounds possess unexpectedly advantageous or superior properties. *In re Papesch,* 315 F.2d 381, 386–87, 50 CCPA 1084, 1091–92, 137 USPQ 43, 47–48 (1963). Direct or indirect comparative testing between the claimed compounds and the closest prior art may be necessary. *In re Merchant,* 575 F.2d 865, 869, 197 USPQ 785, 788 (CCPA 1978); *In re Blondel,* 499 F.2d 1311, 1317, 182 USPQ 294, 298 (CCPA 1974); *In re Swentzel,* 219 F.2d 216, 220, 42 CCPA 757, 763, 104 USPQ 343, 346 (1955). Contrary to the board's apparent suggestion, an applicant need not test compounds taught in each and every reference. *In re Holladay,* 584 F.2d 384, 386, 199 USPQ 516, 518 (CCPA 1978). However, where an applicant tests less than all the cited compounds, the test must be sufficient to permit a conclusion respecting the relative effectiveness of applicant's claimed compounds and the compounds of the closest prior art. *In re Holladay, supra* at 386, 199 USPQ at 518, *In re Merchant, supra* at 869, 197 USPQ at 787–88. Payne's tests are insufficient to permit that conclusion.

Table II and the data on the "Applicants–5" compound in Table V of the Durden affidavit reflect comparative testing between five of Payne's claimed compounds and one compound taught by Addor I.[10] The Addor I compounds proved superior in activity against aphid and housefly.

Payne's compounds proved superior in activity against mite, armyworm, and bean beetle. A finding of obviousness is not precluded, however, when only some, but not all, of the properties of a claimed compound are predictable from the prior art. *See In re Murch,* 464 F.2d 1051, 1056, 59 CCPA 1277, 1283, 175 USPQ 89, 92 (1972).

The tested Addor I compound must be applied at 230 ppm to achieve an $LD$ rating against all the pests tested. The least effective of Payne's tested compounds need be applied at only 140 ppm to achieve that result. That superior broad spectrum pesticidal activity would not have been predictable from Addor I.[11]

Were Addor I the only relevant prior art, Payne's evidence may have been sufficient. Payne may not, however, rely on his mere assertion that the Addor I compound is "representative and superior in pesticidal properties to the compounds described in Addor II, Addor III, Ghosh and Nikles." None of the latter, allegedly inferior, compounds was tested. The assertion is based on data in the references and on Table III data relating to compounds allegedly "analogous" to those described in Addor II and Ghosh. A summary of relevant toxicity data in the references and the Durden test data reads:

---

**10.** The compounds labeled "Applicants–1", "Applicants–2", "Applicants–4", and "Applicants–5" correspond to the compounds recited in species claims 8, 9, 6, and 10 respectively. No test data are provided for any compound of sub-generic claim 4, for the compounds of species claims 7, 11, and 12 or for many of the classes of compounds within generic claim 1 and sub-generic claims 2, 3, and 5. Table I in Payne's specification demonstrates a wide disparity in the pesticidal effectiveness of his compounds, suggesting that no conclusions can be drawn respecting the effectiveness of untested compounds. Hence, Payne's evidence is not commensurate in scope with claims 1–5, 7, 11, and 12 and cannot overcome the rejection of

those claims. *See In re Greenfield,* 571 F.2d 1185, 1189, 197 USPQ 227, 230 (CCPA 1978).

**11.** That a direct linear analog of Payne's "Applicants–5" compound lacks broad spectrum activity (Table V) lends support to Payne's assertion that the claimed compounds yield unexpected results. The board's statement that Tables III through V of the Durden affidavit were "of no evidentiary value for purposes of rebutting the . . . *prima facie* case of obviousness," (emphasis the board's) must be interpreted as indicating that that relevant evidence was entitled to very little weight, *In re Mageli,* 470 F.2d 1380, 1383, 176 USPQ 305, 307 (CCPA 1973), in view of the closer prior art cited.

| Compound | Insect Toxicity (LD$_{50}$, ppm) | | | | |
|---|---|---|---|---|---|
| | Aphid | Mite | Armyworm | Bean Beetle | Housefly |
| (S,S-ring) =NOCONHCH$_3$ — ADDOR-I | ~1 | 90 | 160 | 230 | 0.7 |
| (S,S-ring) =NOCONHCH$_3$ — ADDOR-I | 10 (LD$_{95}$) | - | - | - | - |
| (S,S-ring) =NOCONHCH$_3$ — ADDOR-II | - | - | 1000 (LD$_{100}$) | - | - |
| (S,S-ring) =NOCONHCH$_3$ — ADDOR-III | 10 (LD$_{90}$) | - | 100 (LD$_{40}$) | - | - |
| (S,S-ring) =NOCONHCH$_3$ — GHOSH | 1000 (LD$_{>90}$) | 1000 (LD$_{>90}$) | - | - | - |
| CH$_2$=CH (S,S-ring) =NOCONHCH$_3$ — NIKLES | - | 400 (LD$_{80}$) | 400 (LD$_{100}$) | - | 5 |

---

Payne's data indicate that most compounds are far less effective against armyworm and bean bettle than they are against aphid, mite and housefly. However, he supplies no data respecting the effectiveness of the Addor III and Nikles compounds against bean beetle. Nor does Payne suggest a technique, and none is apparent from the record, for inferring that effectiveness from data relating to other pests.[12]

The data on effectiveness of the compounds of Addor I, Addor III and Nikles against armyworm is inconclusive. The data from Addor I relates only to LD$_{50}$. Addor III teaches that 100 ppm of his compound is required to achieve an LD$_{40}$ rating against armyworm, but provides no indication of the concentration needed to achieve LD$_{50}$.[13] On this record, therefore, the Addor III compound may be as effective against armyworm as Payne's "Applicants–5" compound. Nikles teaches that 400 ppm of his compound will achieve an LD$_{100}$ rating against armyworm. The 400 ppm is not described as a minimum concentration and there is no indication that a lower concen-

12. The "Applicants–3" and "Applicants–4" compounds, for example, are roughly equivalent in effectiveness against bean beetle but differ widely in effectiveness against aphid, mite and armyworm.

13. Addor I teaches that 10 ppm of his compound achieves an LD$_{95}$ rating against aphid.

Durden's Table II indicates approximately 1 ppm of the Addor I compound achieves an LD$_{50}$ rating. Nikles teaches that a concentration of 5 ppm of his compound achieves an LD$_{50}$ rating, and 10 ppm achieves an LD$_{100}$ rating, against houseflies.

tration would not achieve $LD_{100}$. Absent additional data, no meaningful conclusion is possible respecting the relative effectiveness against armyworm of the Addor I and Nikles compounds.

Payne's reliance on an allegedly unexpected broad spectrum activity of his compounds, as evidencing their nonobviousness, must therefore fail in the absence of comparative broad spectrum tests of Nikles' compounds.

Moreover, unlike Addor I, Nikles suggests that his compound possesses broad spectrum activity. Nikles expressly teaches that his compounds "have a surprising range of biological activity, as is observed * * * in the far-reaching control of pests." Nikles conducted successful tests of his compounds against mite and armyworm. His specification states that his compounds are also effective against "houseflies, aphids, caterpillars and beetles." Thus, a person skilled in the art would expect Nikles, not Addor I, to be more representative of the broad spectrum activity of prior art compounds, and Payne's tests of Addor I are insufficient to permit a conclusion respecting the relative broad spectrum effectiveness of the claimed compounds and those of Nikles.

### Conclusion

 Payne having failed to rebut the PTO's prima facie case of obviousness, the rejection of claims 1–12 is *affirmed.*

*AFFIRMED.*